UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

WAYNE L. WRIGHT,

        Plaintiff,

v.                                                                             Case No. 16-C-96

OSHKOSH CORPORATION,

        Defendant.

## DECISION AND ORDER

Plaintiff Wayne L. Wright filed this action against his former employer, Defendant Oshkosh Corporation ("Oshkosh"), alleging that Oshkosh discriminated against him on the basis of his disabilities in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213. More specifically, Wright alleges that Oshkosh failed to reasonably accommodate his disabilities and terminated him due to his disabilities. Wright also alleges a breach of contract claim against Oshkosh for failure to pay his 2013 bonus. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367. This case is now before the Court on Defendant's motion for summary judgment. (ECF No. 19.) For the reasons that follow, Defendant's motion for summary judgment will be granted and this case will be dismissed.

## BACKGROUND

On December 12, 2011, Plaintiff Wayne Wright began working for Defendant Oshkosh Corporation as its Enterprise IT Strategy Execution Office Leader ("SEO Leader"). The SEO Leader position was created for the purpose of "further developing and fine tuning the Enterprise IT Strategy, teaching it to the incoming IT leaders, and assisting them to develop methodologies to

implement and execute the Enterprise IT Strategy within their individual service domains." (DPFOF ¶ 10, ECF No. 32.) Oshkosh asserts the SEO Leader position was intended as a temporary position, with the need for the position dissipating after approximately two years—although Wright contends that the position was never presented to him as temporary. (ECF No. 38, ¶¶ 8–9.)

Wright suffered from a variety of medical conditions during his employment at Oshkosh. During his interviews for the SEO Leader position, Wright informed Oshkosh that he was a "disabled vet" due to back and ankle injuries. Oshkosh subsequently provided Wright with a chair with lumbar support, a stool on which to rest and flex his ankle, and a monitor stand in an effort to accommodate Wright's back and ankle difficulties. In order to perform his duties as the SEO Leader, Wright asserts he needed to stand up and stretch his back and ankle every hour, move his arms, and could not stand for periods longer than 30 minutes. (*Id.* ¶ 77.) Wright informed Oshkosh in February 2012 that he suffered a heart attack and underwent heart surgery prior to starting at Oshkosh. Wright told Oshkosh he did not need any accommodations arising from his heart problems. Throughout his employment, Wright also alerted Oshkosh to other medical conditions, such as diverticulitis and thoracic outlet syndrome.

On May 16, 2013, Wright was diagnosed with idiopathic hypersomnia, a sleeping condition. The Corporate Vice President of IT, Dave Schecklman, asked Wright whether he required any accommodations related to his sleep-related issues. Wright replied that he did not. On June 25, 2013, Wright notified Corporate Segment Human Resources Manager Melanie Bruins that he had a health condition that impacted his ability to get sleep, was taking medications for the condition, and needed to monitor his blood pressure throughout the day. Bruins informed Wright that it would not be a problem to monitor his blood pressure at work as needed. She also told him that if he

2

needed any other accommodations, such as equipment or leave, he should notify her. Bruins also informed Wright that Oshkosh provided short term disability and family medical leave if needed. Wright told Bruins that the purpose of notifying her was so that human resources would be apprised of his condition and that he did not need any accommodations for his idiopathic hypersomnia.

Wright experienced nausea, heartburn, and dizziness on September 30, 2013 and believed he was suffering from a heart attack. He returned to work on October 3 and notified Schecklman that he may have suffered a mild heart attack, needed to undergo a stress test, and may need a heart catheter. Schecklman told Wright to take whatever time off work was needed and advised Wright to look into going on short-term disability. Prior to the elimination of the SEO Leader position, Oshkosh also offered to provide Wright with whatever time off was needed to resolve his medical conditions and offered Wright a medial leave of absence, which Wright refused.

On October 4, 2013, Oshkosh eliminated the SEO Leader position and terminated Wright's employment—although Shecklman had originally notified Bruins of the decision in late August or early September of 2013. Schecklman and Bruins met with Wright on October 4 to discuss the decision. Wright's medical conditions and symptoms were not discussed. Bruins told Wright the decision was not based upon Wright's performance. Wright asked if there were other positions at Oshkosh for which he could apply, which Schecklman seemingly denied. (PPFOF ¶ 107, ECF No. 37.) Two director-level IT positions were open at the time of Wright's termination—a Level 18 IT Services ESG Leader position and a Level 17 Global Data Center Director position. Wright claims he did not apply because Oshkosh told him he could not, whereas Oshkosh asserts that Wright was not qualified for either open position. (ECF No. 38, ¶¶ 53, 60, 69.) The SEO Leader, ESG Leader, and Global Data Center Director positions were all sedentary jobs with similar physical and mental

3

requirements.

Wright did not receive bonus compensation from Oshkosh for work performed during the 2013 fiscal year. When Wright first accepted Oshkosh's offer of employment, the offer letter indicated that "[b]onus payout is subject to conditions of employment as defined in the [Management Incentive Plan] and final approval by the Board of Directors." (DPFOF ¶ 17.) Wright also received a letter from Oshkosh near the end of 2012 regarding bonus eligibility for fiscal year 2013:

> Bonus compensation is subject to conditions of employment. The Oshkosh Corporation Board of Directors, upon review and recommendation by the Human Resources Committee of the Board of Directors, maintains the final approval of any bonus payment to management. The Oshkosh Corporation Board of Directors may amend, approve, or terminate incentive bonus consistent with the best interests of the shareholders of the company at any time. Therefore, this letter is not representative of any agreement to pay or promise to pay a bonus . . . . to be eligible for bonus compensation, you must be an employee of the company on the date of final approval by the Board of Directors, typically at the November 2013 Board Meeting following the fiscal year close. *If you are not an employee of the company for any reason on the date of final approval, you are not eligible for any bonus payment.*

(*Id.* at ¶¶ 30–31) (emphasis added). Wright was not an Oshkosh employee during the November 2013 Board of Director's meeting.

Approximately three weeks after his termination, Wright submitted an application for disability benefits to the Social Security Administration ("SSA"). Some of the conditions Wright identified as preventing him from working included degenerative ankle disease, coronary disease and high blood pressure, idiopathic hypersomnia, and thoracic outlet syndrome. He claimed that his conditions became severe enough to stop working on May 16, 2013 and that he was first unable to work on October 7, 2013. The SSA determined in September 2014 that Wright was 100% disabled and has continuously awarded him monthly disability benefits.

Wright also submitted an Application for Disability Compensation and Related Compensation

4

Benefits to the Department of Veterans Affairs ("VA") in July 2014. Wright wrote he was "claiming total disability because of a service-connected disability which has . . . prevented [him] from securing or following any substantially gainful occupation." (DPFOF ¶ 124.) He further claimed that his "constant back, ankle, left shoulder, left elbow, regular gout attacks coupled with the hypersomnia and severe depression and anxiety makes it impossible for [him] to obtain reasonable gainful employment." (*Id.* ¶ 128.) Wright asserted his conditions affected his full-time employment beginning on August 15, 2013 and that he became too disabled to work on October 20, 2013. The VA concluded that as of July 24, 2014 Wright was 100% disabled and began awarding monthly disability income in August 2014.

## ANALYSIS

**A. Summary Judgment Standard**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460–61 (E.D. Wis.1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In deciding a motion for summary judgment, the court will view the facts in the light most favorable to the non-moving parties. *Crull v. Sunderman*, 384 F.3d 453, 460 (7th Cir. 2004).

**B. ADA Discrimination**

The ADA prohibits discrimination on the basis of disability against "qualified individual[s]."

5

42 U.S.C. § 12112(a). To establish a claim under the ADA, a plaintiff must prove by a preponderance of evidence that he was a qualified person with a disability and that his employer took an adverse action against him on account of his disability. *Hoffman v. Caterpillar, Inc.*, 256 F.3d 568, 571–72 (7th Cir. 2001). For the purposes of its motion for summary judgment, Oshkosh does not dispute that Wright's afflictions constitute a disability or that Oshkosh had knowledge of his conditions.

Oshkosh asserts that Wright is not a qualified individual under the ADA. In order to claim the protection of the ADA, an employee must be disabled and "qualified." *Duda v. Bd. of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1058 (7th Cir. 1998). The ADA defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). As explained by the Seventh Circuit in *Duda*:

> The regulations present two prongs to the definition of "qualified individual." First, the disabled individual "satisfies the requisite skill, experience, education and other job-related requirements of the employment position [he] holds or desires." 29 C.F.R. § 1630.2(m). Second, he "can perform the essential functions of such position" with or without accommodation. *Id.*

133 F.3d at 1058. The determination about whether an individual is qualified "should be based on the qualified disabled individual's capabilities at the time of the employment decision." *Id.* at 1059. Although Oshkosh concedes that Wright met the prerequisites for the SEO Leader position at Oshkosh, it asserts that Wright's receipt of disability insurance benefits as a totally disabled person establishes that he could not perform the essential functions of the position, with or without accommodation.

"Claiming disability benefits and asserting ADA claims are not *always* mutually exclusive,

but a 'plaintiff's sworn assertion in an application for disability benefits that [he] is, for example 'unable to work' will appear to negate an essential element of [his] ADA case—at least if [he] does not offer a sufficient explanation.'" *Butler v. Vill. of Round Lake Police Dept.*, 585 F.3d 1020, 1023 (7th Cir. 2009) (citing *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999)). In order for the plaintiff's explanation to meet the "sufficient" standard, it must "warrant a reasonable juror's concluding that, assuming the truth of, or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless 'perform the essential functions' of [his] job, with, or without 'reasonable accommodation.'" *Cleveland*, 526 U.S. at 807. Based on the undisputed evidence, Wright fails to offer a sufficient explanation for the conflict between his application for disability benefits and his ADA claim.

Wright applied for, and was awarded, disability insurance benefits on the assertion that he was unable to work in any capacity as of October 7, 2013. He also applied for, and was awarded, VA benefits because his medical conditions "prevented [him] from securing or following any substantially gainful occupation" and "ma[d]e it impossible for [him] to obtain reasonable gainful employment." (DPFOF ¶¶ 124, 128.) He also claimed he was too disabled to work. Nevertheless, Wright claims that he "could have continued working at Oshkosh had he been given time to work through his medical issues." (ECF No. 37, ¶¶ 92–93.) Wright attempts to resolve the conflict between his applications for disability benefits and this claim on the basis that neither the SSA or VA factor in whether the claimant could preform the work with reasonable accommodations.

It is undisputed that whenever Wright notified Oshkosh of any medical difficulties, Oshkosh responded by asking if there was anything that it could do to assist him. When Wright notified Oshkosh of back problems, it provided him with a special chair, adjustable monitors, and a foot rest.

7

Wright refused all other offers of help, including a medical leave of absence or going on short term disability. Wright offers no evidence as to what reasonable accommodation would have allowed him to perform the essential functions of his job that Oshkosh had not offered and Wright had not already rejected. In short, Wright has offered no evidence, medical or otherwise, that he could have continued working at Oshkosh or that Oshkosh failed to give him time to work though his medical issues. Wright has failed to establish that he is a qualified individual who, with or without reasonable accommodation, could perform the essential functions of his job. Therefore, I need not address whether Oshkosh took an adverse action on account of Wright's disability and summary judgment in favor of Oshkosh is appropriate on Wright's disability discrimination claim.

Because Wright has failed to meet his burden of proof on the initial question of whether he is a qualified individual, it is also not necessary to decide whether Oshkosh had a duty to offer him a reasonable accommodation in the form of allowing him to apply and interview for one of the two vacant director-level IT positions. It is unclear how shifting Wright to a vacant position would qualify as an accommodation—it is undisputed that those jobs had similar physical and mental requirements to the SEO Leader position Wright had occupied. If Wright could not perform the essential functions of the SEO Leader position as he alleged in his applications for disability benefits, then he also could not perform the essential functions of the other IT roles. Additionally, an employer is required to engage in a flexible and interactive process to identify a reasonable accommodation only after the employee requests an accommodation. *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996). Here, Wright did not ask to interview for the open positions because he was seeking a medical accommodation—he did so because his position at Oshkosh had been eliminated. Summary judgment must also be granted in favor of Oshkosh on

8

Wright's failure to provide reasonable accommodations claim.

**D. Breach of Contract**

Finally, Wright has failed to raise a genuine issue of material fact on his breach of contract claim. He argues he was entitled to the bonus payment because of statements made by Oshkosh's in-house counsel, Robert Johnson. Johnson allegedly told Wright on October 13, 2015 that Oshkosh had continued Wright's employment beyond September 30, 2014, Wright had earned the bonus, Oshkosh approved payment for the bonus, and that Wright would be entitled to and receive his annual bonus remuneration. (*Id.*) However, it appears the statements were made during settlement discussions during Wright's administrative charge of discrimination through the Wisconsin Equal Rights Division. (ECF No. 47, ¶¶ 136–38.) Statements made during negotiations are not admissible to prove the validity of a disputed claim. Fed. R. Evid. 408(a)(2). The purpose of Rule 408 is to encourage settlements because "[t]he fear is that settlement negotiations will be inhibited if the parties know that their statements may later be used as admissions of liability." *Kritikos v. Palmer Johnson, Inc.*, 821 F.2d 418, 423 (7th Cir. 1987) (citing *Central Soya Co., Inc. v. Epstein Fisheries, Inc.*, 676 F.2d 939, 944 (7th Cir. 1982)). Thus, Johnson's alleged statements more than two years after Wright's termination will not be considered as part of Wright's breach of contract claim.

Oshkosh terminated Wright's employment on October 4, 2013. Oshkosh notified all its employees in late 2012 that "[i]f you are not an employee of the company for any reason on the date of final approval, you are not eligible for any bonus payment." Wright was not an Oshkosh employee on the date of final approval: the November 2013 Board of Directors meeting. Accordingly, Wright was not eligible for the 2013 bonus. Wright also acknowledges that it is entirely within Oshkosh's discretion to determine whether to pay bonuses to its employees. (ECF

9

No. 36 at 24.) Oshkosh was under no contractual obligation to pay Wright bonus compensation for the work he performed during the 2013 fiscal year. Therefore, Wright's breach of contract claim will be dismissed.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Oshkosh Corporation's motion for summary judgment (ECF No. 19) is **GRANTED** and this action is **DISMISSED**. The Clerk is directed to enter judgment forthwith.

**SO ORDERED** this   24th   day of March, 2017.

                                       s/ William C. Griesbach
                                       William C. Griesbach, Chief Judge
                                       United States District Court